Brian S. King, #4610
Brent J. Newton, #6950
BRIAN S. KING, PC
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com

Attorneys for Plaintiffs

---

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHARLES W. AND ZOE W.<br><br>    Plaintiffs,<br><br>v.<br><br>REGENCE BLUECROSS BLUESHIELD OF OREGON,<br><br>    Defendant. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Civil No. 2:17-cv-00824 TC<br><br>Judge Tena Campbell |

Plaintiffs Charles W. ("Chuck") and Zoe W. ("Zoe"), through their undersigned counsel and pursuant to F.R.Civ.P. 56, and DUCiv 56-1, submit their Motion for Summary Judgment and Memorandum in Support against Regence BlueCross BlueShield of Oregon, ("RBCBSO").

The pre-litigation appeal record ("Record") for this ERISA-governed case has been provided to the Court pursuant to court order. The sealed Record was filed with the clerk on a disc along with a paper courtesy copy thereof to chambers. The Record consists of documents Bates stamped RBCBSO 000001 through RBCBSO 013770. Citations to the record will be designated, using the first page as an example, as Rec. 1.

## INTRODUCTION

Zoe experienced a common emotional trauma when her parents divorced before her third birthday. Following the divorce, she spent most of the time with her mother. Around Zoe's sixth birthday, her mother was diagnosed with cancer and later died. Zoe then went to live with her father, Chuck. After the death of her mother, Zoe struggled with her emotional regulation and the relationship with her father. As things between them got more strained, in middle school Zoe went to live with her aunt in another state to see if that would help. Zoe didn't even last the school year.

When she came home things did not improve.  Following a falling out with a close friend, Zoe cut her own wrists with a knife. Fortunately, she was able to call for help and she failed in the attempt to take her own life. Due to the serious and possibly lethal nature of her actions, Chuck had Zoe admitted for acute hospitalization after the suicide attempt. After a two-week stay she continued treatment in a sub-acute residential setting for about a month. Unfortunately, even after leaving treatment the mental health problems that led to such a drastic action persisted and Zoe's risky and threatening behaviors continued. When Zoe's threats of suicide proved too intense for her father to handle in an in-home setting with outpatient services, Chuck followed the recommendations of the mental health professionals caring for Zoe and enrolled Zoe in a subacute inpatient residential treatment setting at New Haven on June 11, 2014.

Because Zoe was covered as a dependent under Chuck's insurance plan, Chuck submitted his claim to RBCBSO so that it could arrange to pay for Zoe's treatment. Chuck was justifiably surprised when RBCBSO denied the claim stating that New Haven did not meet RBCBSO requirements as a contracting provider for mental health residential treatment. Chuck appealed and pointed out to RBCBSO that New Haven was not a contracting provider with RBCBSO and the special facility criteria it used to deny the claim would not apply. Chuck also demonstrated

that Zoe's mental health and chemical dependency conditions were medically necessary covered benefits under the terms of the plan. He supported his argument with a history of Zoe's mental health and substance abuse struggles. He documented those struggles with letters from Zoe's providers at New Haven as well as her treatment records from her previous acute hospitalization.

Chuck's thorough presentation paid off. RBCBSO reversed its position that New Haven did not meet certain requirements for contracting residential treatment centers. RBCBSO evaluated the claim for medical necessity and concluded that Zoe's conditions met the medical necessity requirements. It then paid the claim from admission until August, 21, 2014. Using an isolated psychiatric note written by William Bunn, D.O., RBCBSO decided that after that date Zoe no longer met the criteria for residential treatment. RBCBSO came to that conclusion even though the same Dr. Bunn submitted a November 6, 2014 letter attached to Chuck's December appeal stating his professional opinion that Zoe's "admission was and is medically necessary."

RBCBSO also overlooked that the MCG discharge guidelines required that Zoe meet all of the criteria and conditions before recommending discharge. RBCBSO ignored serious symptoms when it recommended discharge and ignored the ongoing relationship difficulties between Zoe and her father as well as Zoe's high impulsivity and unreliability. RBCBSO also disregarded its own conclusion that Zoe experienced major dysfunctions in daily living.

The MCG discharge guidelines require that before discharge is warranted the risk to the patient be reduced and improvement exist in six particular areas of risk. The criteria require that the patient supports, namely Chuck, and the patient, Zoe, understand the follow-up treatment and crisis plan and that safe treatment is available at a lower level of care. The problem was that the same behaviors that led RBCBSO to conclude that Zoe's treatment was necessary continued to exist on the date RBCBSO terminated Zoe's coverage. Numerous log entries supported the

conclusion that Zoe was not prepared to participate in a follow up plan outside of the residential treatment setting. Discharging her on August 21, 2014, would have placed her at serious risk.

When Chuck appealed the new rationale for the denial, he provided RBCBSO with additional documentation and recommendations that supported Zoe's ongoing treatment. The pre-litigation record contained the ongoing recommendations from Zoe's treating physician and providers at New Haven. Chuck also provided references to numerous logs that reflected Zoe's ongoing problems and the challenges in the parent child relationship.

Zoe completed her treatment at New Haven in June of 2015. In light of her progress, Chuck was determined to keep her at New Haven despite RBCBSO's refusal to pay and the fact that he was required to pay those expenses out of his own pocket himself. Zoe was able to accomplish the necessary work because she was in a facility that gave her the time and space to process her mental health and substance abuse issues as well as create a healthy interaction process with her father.

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Parties and Jurisdiction

1. The Plaintiffs, Chuck and Zoe are natural persons residing in Multnomah County, State of Oregon. Docket # 4, Amended Complaint ("Complaint") at ¶1, Docket # 7, Answer to Amended Complaint ("Answer") at ¶1

2. Chuck is employed by the Broadway Medical Clinic which provides benefits for its employees including a group health benefit plan ("the Plan"). Chuck is a participant in the Plan and his daughter, Zoe is a beneficiary under the Plan. Complaint ¶2, Answer ¶2

3. The Plan is an employee welfare benefit plan under 29 U.S.C. §1001 et. seq., of the Employee Retirement Income Security Act of 1974 ("ERISA"). Complaint ¶3, Answer ¶3

4. RBCBSO is an insurance company with its principal place of business in the state of Oregon. Rec. 21, Complaint ¶4. RBCBSO provides health insurance to a variety of individuals and businesses and transacts business in Utah through its local Regence BlueCross BlueShield of Utah ("Regence"). Zoe's claims were submitted to Regence for processing. Complaint ¶4, Answer ¶4.

5. RBCBSO is the insurer of the Regence Innova Medical Plan. Complaint ¶5, Answer ¶5.

6. Zoe received medical care and treatment in Utah at Solacium New Haven RTC, ("New Haven) in the state of Utah. Complaint ¶6, Answer ¶6. New Haven is a licensed health care provider in the state of Utah and provides treatment for adolescent girls with mental health conditions. Rec. 214-218

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331. Complaint ¶7, Answer ¶7.

8. Based on ERISA's nationwide service of process, and because RBCBSO does business in Utah through its local affiliate, Regence, venue is proper under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §13391. Complaint ¶8, Answer ¶8.

9. The Plaintiffs seeks benefits under the terms of the Plan and ERISA pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g). Complaint ¶9, Answer ¶9.

**Defined Terms Within The Plan**

10. The Plan provides coverage for inpatient and outpatient Mental Health and Chemical Dependency Services for treatment of Mental Health or Chemical Dependency Conditions. Rec. 40.

11. "Chemical Dependency or Mental Health Services mean Medically Necessary outpatient services, Residential Care, partial hospital program or inpatient services provided by a licensed facility or licensed individuals. …" Rec. 40

12. "Medically Necessary or Medical Necessity means health care services or supplies that a Physician or other health care Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease, or its symptoms, and that are:

    ○ In accordance with generally accepted standards of medical practice;

    ○ Clinically appropriate, in terms of type, frequency, extent. Site and durations, and considered effective for the patient's illness, injury or disease; and

    ○ Not primarily for the convenience of the patient, Physician or other health care Provider, and not more costly than an alternative service or sequence of service or supply at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.

    For these purposes, 'generally accepted standards of medical practice' means standards that are based on credible Scientific Evidence published in Peer-Reviewed Medical Literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians and other health care Providers practicing in relevant clinical areas and other relevant factors." Rec. 91-92

13. "Covered Service means a service, supply, treatment or accommodation that is listed in the benefits sections in this Booklet." Rec. 90

### Milliman Guidelines/MCG Criteria

14. RBCBSO used the Milliman Care Guidelines (MCG) to evaluate whether the treatment provided to Zoe was medically necessary.

6

15. RBCBSO ultimately agreed that Zoe met the Admission Guidelines for Residential Acute Behavioral Health Level of Care, Child or Adolescent. Rec. 1852-1853, 18891890

16. Per the Guidelines "Admission to Residential Acute Level of Care is judged appropriate as indicated by **ALL** of the following:

- Around-the-clock behavioral care is necessary for treatment because of 1 or more of the following:
  - Imminent danger to self is present due to **1 or more** of the following:
    - Imminent risk for recurrence of Suicide attempt or act of serious Harm to self is present as indicated by **ALL** of the following:
      1. There has been very recent Suicide attempt or deliberate act of serious Harm to self.
      2. There has not been Sufficient Relief Of The factors that precipitated the attempt or act.

    - Current plan for suicide or serious Harm to self is present.
    - Command auditory hallucinations for suicide or serious Harm to self are present.
    - The patient is engaging in dangerous behavior, or has persistent Thoughts of suicide or serious Harm to self, or suicide trigger state without formed thoughts, that cannot be adequately monitored at lower level of care as indicated by **1 or more** of the following:
      1. The Necessary Child or adolescent behavioral care (such as the required provider or lower level facility) is not available or is insufficient.
      2. Severe conflict in family environment or other inadequacy inpatient support systems present
      3. Patient characteristics such as high impulsivity, unreliability, or extreme  agitation with desperation are present.
      4. Ruminative flooding; uncontrollable and overwhelming profusion of negative thoughts are present.
      5. Frantic Hopelessness; fatalistic conviction that life will not improved along with oppressive sense of entrapment and doom is present.

    . . . .

    - Life-threatening inability to receive adequate care from caregivers is present (such as neglect from caregivers or inability to receive necessary care at lower level of care)
    - Severe disability or disorder requiring acute residential intervention is present as indicated by **ALL** of the following:

- ○ Severe behavioral health disorder-related symptoms or condition are present as indicated by **1 or more** of the following:
  - ■ Major dysfunction in daily living is present (eg, family, interpersonal, school functioning).
  - ■ Severe problem with cognition, memory, or judgment is present.
  - ■ Severe psychiatric symptoms are present (eg, hallucinations, delusions, other acute psychotic symptoms, mania, severe autistic behaviors).
  - ■ Evidence of severely diminished ability to assess consequences of own actions is present (eg, acts of severe property damage).
  - ■ Frequent extreme external (extreme angry outbursts) or internal (extreme sulking and rumination) anger manifestations are present.
  - ■ A high level of family conflict is present.
  - ○ Patient management for the symptoms or condition at highest nonresidential level of care has failed or is not feasible at present.
  - ○ Severe comorbid substance use disorder is present that must be controlled (eg, abstinence necessary) to achieve stabilization of primary psychiatric disorder.
  - ○ Patient currently has stabilized during inpatient treatment stay for severe symptoms or behavior and requires structured setting with continued around-the-clock behavioral care.
- ■ There are no exclusions to treatment: situation and expectations are appropriate for residential levels indicated by **ALL** of the following:
  - ○ Recommended treatment is necessary, appropriate,and not feasible at a lower level of care (ie, documented behavior, symptoms, or risk judged not appropriate for partial hospital, IOP, or acute outpatient care).
  - ○ Very short-term crisis intervention and resource planning for further care at a nonresidential level is unavailable or judged inappropriate.
  - ○ Patient has at least some minimal motivation to participate in treatment within a highly structured setting at the direction of parent or guardian.
  - ○ There is no anticipated need for physical restraint, seclusion, or other involuntary control(eg, patient not actively violent).
  - ○ There is no need for around-the-clock medical or nursing care.
  - ○ Patient has sufficient cognitive capacity to respond to planned individual and group treatment components.

8

16. Adequate response (eg, stabilization for nonresidential level of care) to planned treatment is expected within a limited time period. Rec. 309-310.[1]

17. The MCG Criteria for Discharge indicate continued residential care generally is needed until 1 or more of the following:

- Residential care no longer necessary due to adequate patient stabilization or improvement as indicated by ALL of the following:
  - Risk status acceptable as indicated by ALL of the following:
    - Patient has not recently made a Suicide attempt or act of serious Harm to self, or has had Sufficient relief of precipitants of any such action.
    - Absence of Current plan for suicide or serious Harm to self for at least 24 hours
    - Thoughts of suicide, homicide, or serious Harm to self or to another are absent or manageable at available lower level of care.
    - Supports, and patient as appropriate, understand follow-up treatment and crisis plan.
    - Provider and supports are sufficiently available at lower level of care.
    - Patient, as appropriate, can participate as needed in monitoring at next level of care.
  - Functional status acceptable as indicated by 1 or more of the following:
    - No essential function is significantly impaired.
    - An essential function is impaired, but impairment is manageable at available lower level of care.
  - Medical needs manageable as indicated by ALL of the following:
    - Adverse medication effects absent or manageable at available lower level of care
    - Medical comorbidity absent or manageable at available lower level of care
    - Substance withdrawal absent or manageable at available lower level of care
- Residential care no longer appropriate due to patient progress record or consent as indicated by 1 or more of the following: N/A
  - Patient deterioration requires higher level of care.
  - Guardian no longer consents to treatment. Rec. 310-311

//

//

---

[1] The Record contains multiple references to the MCG criteria used by RBCBSO. The citations at Rec. 309-311 show the internal log entries made by the reviewer. A more clear copy of the admission and discharge guidelines can be found at Rec. 1889-1891.

9

## Zoe's Background and Treatment History

17. Chuck and Zoe's mother divorced when Zoe was two-and-a-half years old. Zoe lived primarily with her mother, with whom she was very close, until her mother died of ovarian cancer when Zoe was six years old. Rec. 174

18. Zoe became very depressed as she started middle school, and her grades plummeted. She became very isolated and withdrawn. Even on a family trip to Disneyland, she refused to leave the hotel room and spent the whole trip sleeping. Rec. 174

19. Zoe's maternal aunt offered a place for Zoe to live when she started 7th grade. The family hoped that the change would be good for Zoe. Rec. 174

20. Instead, Zoe became angry, resistant, and rebellious and returned home before the school year ended. Rec. 175

21. Zoe was evaluated by a psychiatrist, who diagnosed Zoe with depression and she began regular counseling with a psychologist, Dr. Amy Stoeber. For more than a year, Zoe never disclosed to her counselor or Chuck that she had been cutting herself. Zoe began sneaking out and using drugs. She also missed school often because she could not get out of bed because of her depression. Rec. 175, 226

22. Zoe attempted suicide and was hospitalized for two weeks. Rec. 174, 237, 449. The psychiatrist recommended ongoing inpatient inpatient treatment, given the severity of Zoe's depression, the frequency of her self-harm, and her propensity to conceal how severely her symptoms were affecting her. Zoe continued to be a high risk for suicide. Rec. 175, 237-243

23. Zoe attended an inpatient program in Corvallis, Oregon, where she was treated for four weeks. Zoe did well and was discharged to attend a new high school. Rec. 175, 259-261.

24. Zoe's improvement did not last and she again became withdrawn, isolated and depressed. She continued to sneak out, seeking drugs and meeting boys. Zoe was taken to the hospital following a fall at home. Chuck suspected that Zoe was on drugs and his suspicion was confirmed by the hospital. Rec. 175.

25. Zoe's counseling became more intensive and adjustments were made to her medication. However, she continued to experiment with various substances. She lost significant amounts of weight and would not attend school, or when she did, would sleep through her classes. Rec. 175-176

26. Zoe began threatening suicide regularly and Chuck feared for Zoe's life. Rec. 176

27. Zoe was admitted to New Haven on June 11, 2014 and within a few days RBCBSO denied coverage for her treatment, asserting that New Haven "does not provide the necessary intensity of services for coverage of mental health residential treatment." Rec. 182 The RBCBSO denial letter, dated June 19, 2014 included a long list of criteria that RBCBSO alleged that New Haven did not meet. Rec. 182-183, Complaint ¶20, Answer ¶20

28. Chuck submitted his first level appeal on December 10, 2014. Chuck produced relevant documents that showed the criteria relied on by RBCBSO to deny coverage were not general criteria for evaluating residential treatment, but were criteria RBCBSO used to decide whether a facility could be a Regence preferred provider. Rec. 168-174, Complaint ¶21, Answer ¶21

29. Chuck argued that the criteria were inapplicable to New Haven because it was not a Regence preferred provider. He then referred to the Plan which includes coverage for non-network, [non-preferred] providers at a lower rate of reimbursement (60%) from the plan. Rec. 40-41, 169-174, Complaint ¶22, Answer ¶22

30. Chuck went on to argue that New Haven is a licensed residential treatment facility in the State of Utah and meets all of the requirements of the Administrative Code for Utah describing what a licensed facility must do. He stated that New Haven was in full compliance with the Code, and Zoe's treatment should have been covered at the non-network rate. Rec. 172-174, Complaint ¶23, Answer ¶23

31. Chuck included with his appeal copies of Zoe's medical records, letters of recommendations from her physicians and therapists, and other supporting materials. Rec. 168-180, 225-229, 230-613, 614-1842, Complaint ¶24, Answer ¶24.

32. RBCBSO responded to Chuck's appeal on January 13, 2015, and partially overturned its denial of coverage for Zoe's treatment. RBCBSO said that it would cover Zoe's treatment from the date of her admission, June 11, 2014, through August 21, 2014. However, after August 21, 2014, RBCBSO asserted that Zoe's condition no longer met criteria for residential treatment and the care was not medically necessary after that date. Rec. 1852-1854. Complaint ¶25, Answer ¶25

33. Chuck submitted a second appeal on July 9, 2015. In his appeal, Chuck discussed in detail the MCG criteria which RBCBSO had stated were utilized to evaluate Zoe's claim. Chuck argued that the bases for RBCBSO's denial did not coordinate with the MCG criteria and that properly applying them to Zoe's claim indicated that she did, in fact, continue to require residential treatment. Rec. 1916-1923, 1889-1892.

34. Chuck provided specific citations to Zoe's medical records to support his argument that Zoe continued to meet the MCG medical necessity criteria and did not meet the MCG discharge guidelines. He again included updated medical records and other supporting documentation. Rec. 1889-1891, 1918-1922.

35. RBCBSO issued its final denial on August 7, 2015. The letter asserted that the denial was based on "Residential Acute Behavioral Level of Care, Child or Adolescent" criteria and that under those criteria Zoe's symptoms and condition did not allow for continued coverage at New Haven because her treatment there after August 22, 2014, was not medically necessary under the terms of the Plan. Rec. 1867-1870.

36. Chuck exhausted his appeal obligations under the terms of the Plan and ERISA. Complaint ¶29, Answer ¶29

37. The wrongful denial of coverage for Zoe's treatment has damaged the Plaintiffs in the form of requiring Chuck to pay Zoe's medical expenses in an amount exceeding $140,000. Complaint ¶30, Answer ¶30, Rec. 13732-13759

## ARGUMENT

## I. THIS COURT SHOULD REVIEW THIS DENIAL OF COVERAGE UNDER A DE NOVO STANDARD OF REVIEW BECAUSE THE PLAN DOCUMENT LACKS DISCRETIONARY AUTHORITY LANGUAGE FOR RBCBSO.

The Plan does not contain language that grants RBCBSO discretionary authority to interpret the terms of the plan. When an ERISA benefit plan fails to give clear discretionary authority to a plan administrator to determine eligibility for a claim or construe the terms of a plan, a district court will review a denial of benefits claim de novo.[2] While conducting a de novo review, this Court will order RBCBSO to pay for Zoe's care as long as a preponderance of the evidence shows that Chuck and Zoe are entitled to relief.[3] Once RBCBSO reversed its decision to deny benefits and found that Zoe's treatment at New Haven was medically necessary, the Defendant has essentially conceded that Chuck initially met his burden on the question of medical necessity. The fact that RBCBSO paid for some of the treatment also demonstrates that

---

[2] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).
[3] *LaAsmar v. Phelps Dodge Corp. Life, AD&D and Dependent Life Ins. Plan*, 605 F.3d 789, 800 (10th Cir. 2010); *Dewsnup v. UNUM Life Ins. Co. of America,* 2018 U.S. Dist. LEXIS 208688, *20 (D. Utah 2018) (Campbell, J.); *Armani v. Northwestern Mut. Life Ins. Co.*, 840 F.3d 1159, 1162-1163 (9th Cir. 2016).

the service was covered under the Plan. The only question after that decision is whether Zoe continued to meet the requirements that her residential treatment was medically necessary. As discussed more fully below, Zoe's treatment was medically necessary until her discharge in June of 2015, and as such Chuck and Zoe have satisfied their burden of proof under the terms of the Plan. Because Chuck and Zoe are entitled to coverage, this Court should reverse the decision to deny coverage after August 21, 2014 and order RBCBSO to pay for Zoe's treatment costs.

II.   **RBCBSO CORRECTLY REVERSED ITS DECISION THAT NEW HAVEN DID NOT PROVIDE THE NECESSARY INTENSITY OF SERVICES FOR COVERAGE OF RESIDENTIAL TREATMENT.**

Chuck successfully appealed RBCBSO's initial decision that denied all coverage for Zoe's treatment at New Haven. In his first appeal on December 10, 2014, Chuck proved that his policy allowed him broad discretion on choosing a provider for mental health treatment.[4] Chuck also explained that RBCBSO was wrong when it applied a standard for residential treatment centers that had a preferred contract with RBCBSO to New Haven.[5] As a non-contracting facility New Haven was not required to meet the criteria that RBCBSO outlined in its denial letter.[6] As a result, RBCBSO determined that instead of denying the claim for coverage based on the treatment centers' conformity with preferred contract criteria, it should have reviewed Zoe's care for medical necessity.[7]

The pre-litigation record revealed that RBCBSO always knew that it should have assessed Zoe's claim under medical necessity criteria. More than one month before Zoe's admission to New Haven, a New Haven employee contacted Regence to verify benefits.[8] "[Verification of Benefits]: 5/7/14 w/ Patty @ Regence 4:01 pm. Confirmed [Residential

---

[4] Rec/ 171
[5] Rec. 170
[6] Rec. 182-183, 307
[7] Rec. 307, 1852-1853
[8] Rec. 161

Treatment Center] out of network benefits based on Med. Necc. Auth is a requirement to use."[9]
New Haven also sent the verification of benefit results to Chuck with an insurance agreement.[10]
Two days after Zoe was admitted to New Haven the record reflects that New Haven again
contacted RBCBSO and learned that it would receive the decision on coverage within three days
of sending the records to RBCBSO.[11] Since RBCBSO knew that it should have applied the
medical necessity requirements from the beginning, it should have never denied the claim
applying an intensity of services requirements that was inapplicable to New Haven.

### III.     WHEN RBCBSO FINALLY CONDUCTED A MEDICAL NECESSITY REVIEW, IT CORRECTLY FOUND THAT ZOE'S TREATMENT QUALIFIED FOR COVERAGE UNDER THE TERMS OF THE PLAN.

During Chuck's first appeal he successfully argued that Zoe's treatment at New Haven
was a covered benefit that met the Medical Necessity and Medically Necessary requirements that
were required under the terms of his insurance policy. The policy essentially required a three-
step process to determine if coverage was available under the terms of the Plan. First, the service
had to be a covered benefit. Second, to be a covered benefit, the service had to be listed in the
Plan. Finally, the listed service must have been medically necessary as defined by the Plan.

While at New Haven, Zoe received mental health and chemical dependency services.[12]
Pursuant to the terms of the Plan, both mental health and chemical dependency services qualified
as covered services for both inpatient and outpatient treatment of mental health or chemical
dependency conditions.[13] Because, RBCBSO denied the claim on a completely separate
rationale, RBCBSO did not conduct a medical necessity review when it first received the claim
for services.

---

[9] Rec. 161
[10] Rec. 161
[11] Rec. 161
[12] Rec. 619-625
[13] Rec. 40-41, 90

As part of that appeal, RBCBSO acknowledged that it should have conducted a medical necessity review to determine if Zoe's treatment was a covered service.[14] The Plan provided:

> "Medically Necessary or Medical Necessity means health care services or supplies that a Physician or other health care Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease, or its symptoms, and that are:
> - In accordance with generally accepted standards of medical practice;
> - Clinically appropriate, in terms of type, frequency, extent. Site and durations, and considered effective for the patient's illness, injury or disease; and
> - Not primarily for the convenience of the patient, Physician or other health care Provider, and not more costly than an alternative service or sequence of service or supply at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible Scientific Evidence published in Peer-Reviewed Medical Literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians and other health care Providers practicing in relevant clinical areas and other relevant factors."[15]

To answer the question of medical necessity, RBCBSO turned to the MCG Criteria for Residential Acute Behavioral Health Level of Care, Child or Adolescent.[16] Following the step-by-step procedure outlined by the admission guidelines, RBCBSO determined that Zoe's conditions met all the criteria that were required for treatment at a residential level of care.[17] First, she met the criteria that around-the-clock behavioral care is necessary for treatment.[18] Namely that Zoe was an imminent danger to herself because

---

[14] Rec. 306, 1852-1853

[15] Rec. 91-92

[16] Rec. 1852, 309-311, 1889-1891. On its face, there is some question about whether the MCG Guidelines properly address evaluation of the medical necessity of residential treatment. Residential treatment is a *sub-acute,* or "intermediate" level of treatment for mental health conditions. 78 Fed. Register 68239, 68246 (preface to Final Rules of the Mental Health Parity and Addiction Equity Act of 2008). As such, it is questionable whether the MCG criteria's characterization of residential treatment as an "acute" behavioral health level of care accords with the "generally accepted standards of medical practice" the Plan's definition of "medical necessity" and "medically necessary" requires be applied in evaluating whether treatment is covered under the Plan. Nevertheless, Zoe's treatment qualifies for coverage under the specific elements of the MCG criteria involving discharge guidelines.

[17] Rec. 1852, 309-311, 1889-1891

[18] Rec. 309

she had engaged in dangerous behavior, had persistent thoughts of suicide, including self-harm behaviors like cutting, and outpatient treatment had failed.[19] As part of its review, RBCBSO acknowledged that Zoe experienced severe conflict in her family environment and had characteristics such as high impulsivity, unreliability, or extreme  agitation with desperation.[20]

RBCBSO then determined that Zoe's conditions were sufficiently severe that she required residential intervention. Again, applying Zoe's situation to the MCG criteria, RBCBSO only had to find one of the following conditions and it found four.

- Major dysfunction in daily living is present (eg, family, interpersonal, school functioning).
- Evidence of severely diminished ability to assess consequences of own actions is present (eg, acts of severe property damage).
- Frequent extreme external (extreme angry outbursts) or internal (extreme sulking and rumination) anger manifestations are present.
- A high level of family conflict is present.[21]

RBCBSO also found that Zoe met each of the following criteria:

- Patient management for the symptoms or condition at highest nonresidential level of care has failed or is not feasible at present.
- Severe comorbid substance use disorder is present that must be controlled (eg, abstinence necessary) to achieve stabilization of primary psychiatric disorder.
- Patient currently has stabilized during inpatient treatment stay for severe symptoms or behavior and requires structured setting with continued around-the-clock behavioral care.[22]

Finally, RBCBSO determined that there were no exclusions to treatment and that Zoe's conditions met all of the following:

- Recommended treatment is necessary, appropriate, and not feasible at a lower level of care (ie, documented behavior, symptoms, or risk judged not appropriate for partial hospital, IOP, or acute outpatient care).

---

[19] Rec. 309-310
[20] Rec. 309
[21] Rec. 309-310
[22] Rec. 310

- Very short-term crisis intervention and resource planning for further care at a nonresidential level is unavailable or judged inappropriate.
- Patient has at least some minimal motivation to participate in treatment within a highly structured setting at the direction of parent or guardian.
- There is no anticipated need for physical restraint, seclusion, or other involuntary control(eg, patient not actively violent).
- There is no need for around-the-clock medical or nursing care.
- Patient has sufficient cognitive capacity to respond to planned individual and group treatment components.
- Adequate response (eg,stabilization for nonresidential level of care) to planned treatment is expected within a limited time period.[23]

Given the extensive findings that RBCBSO made, it clearly arrived at the right decision when it reversed its original decision to deny benefits and found that Zoe's conditions met the medical necessity requirements as defined by the Plan.

## IV.     ZOE DID NOT SATISFY ALL OF THE RISK FACTORS UNDER THE DISCHARGE GUIDELINES. CONSEQUENTLY, RBCBSO SHOULD HAVE CONTINUED PAYMENT FOR HER CARE AFTER AUGUST, 2014.

Zoe's unstable mental health status, family relationships, and avoidance of substance abuse treatment at New Haven made clear RBCBSO's decision that she no longer needed residential treatment after August 21, 2014, was wrong.  The MCG criteria that RBCBSO applied to confirm her medical necessity for residential treatment contains a section with discharge guidelines.[24] Those guidelines indicate that residential care is generally needed until the patient has stabilized in three principle areas: risk status, functional status and medical needs.[25] There is no need to address whether Zoe met the functional status or medical needs components of the discharge guidelines. A risk status that warrants discharge requires all of six

---

[23] Rec. 310

[24] Rec. 1891

[25] Residential care can also be terminated if the patient requires a higher level of care or if the guardian no longer consents to treatment. Neither situation applied to Zoe's case as noted in the Rec. at p. 311.

specific findings to be met before discharge is recommended.[26] The six elements of the risk status portion of the discharge guidelines are:

- ○ Patient has not recently made a Suicide attempt or act of serious Harm to self, or has had Sufficient relief of precipitants of any such action.
- ○ Absence of Current plan for suicide or serious Harm to self for at least 24 hours
- ○ Thoughts of suicide, homicide, or serious Harm to self or to another are absent or manageable at available lower level of care.
- ○ Supports, and patient as appropriate, understand follow-up treatment and crisis plan.
- ○ Provider and supports are sufficiently available at lower level of care.
- ○ Patient, as appropriate, can participate as needed in monitoring at next level of care.

As part of its appeal/reconsideration, RBCBSO asserted, without explanation that Zoe met all of the criteria for discharge.[27] However, RBCBSO's own appeal/reconsideration document contains references to medical records that contradict that very conclusion. Because Zoe failed to meet three of the six criteria, RBCBSO erroneously terminated her coverage in August of 2014.

### A. Neither Zoe nor her Father Were Prepared for Discharge

Zoe and her father were unable to implement the necessary requirements to minimize Zoe's risk if she were discharged to a lower level of treatment. Three of the six risk-status discharge requirements assess the ability of the patient and her support to maintain safety outside of the residential setting. This showing is made:

1. When a patient and her support system understand the follow-up treatment and crisis plan,

2. Provider and supports are sufficiently available at lower level of care.

---

[26] Rec. 1891
[27] Rec. 310-311

3. Patient, as appropriate, can participate as needed in monitoring at next level of care.[28]

Zoe and her father could not meet any of these requirements by the discharge guidelines. The medical records demonstrate that Zoe was too immature and lacked the insight to understand follow up treatment and safely implement a crisis plan. Because her mother had died, placement with relatives had failed, and the relationship between Zoe and her father remained strained, supports were not available at a lower level of care. Additionally, her therapists had determined that Zoe was not likely to succeed at a lower level of care. The same problems of would interfere with Zoe's ability to monitor her next level of care. Each of these issues is discussed more fully below.

A review of the treatment logs at the times RBCBSO asserted Zoe's conditions justified discharge reveals she did not satisfy the discharge guidelines. The Supreme Court has ruled that treating physicians are not entitled to any deference in ERISA benefit denial cases.[29] But it is also true that RBCBSO "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[30] Likewise, treating physicians have a "greater opportunity to know and observe the patient as an individual compared to individuals who have not examined the patient and are simply reviewing medical records."[31]

Similarly, in light of the Tenth Circuit principle that "[f]iduciaries cannot shut their eyes to readily available information,"[32] RBCBSO must fairly consider the opinions of Zoe's treating

---

[28] Rec. 1891
[29] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).
[30] *Id.*
[31] *Id*. at 832 (internal citations omitted).
[32] *Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004)

providers and "see that those entitled to benefits receive them . . ." considering the interests of deserving beneficiaries as they would their own.[33]

Even before *Nord* was decided, the Tenth Circuit held that un-refuted evidence or testimony presented by a claimant in the pre-litigation claim and appeal process may not be disregarded by an ERISA plan administrator.[34] "Testimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, un- impeached . . . must be taken as true.... Un-impeached credible evidence many not be disregarded by the trier of fact" as RBCBSO did here.[35]

It is especially improper to ignore the findings and conclusions of a patient's treating physicians when dealing with the care of individuals who have mental, behavioral, or emotional conditions. When the information from a medical record arises out of an examination of a mental health patient, the treating physician is in a better position to evaluate and come to valid conclusions about the symptoms and diagnoses of a patient than a record reviewer.[36] RBCBSO cannot "cherry-pick[] the information contained in the administrative record…helpful to its decision to deny" coverage for Zoe's treatments.[37]

In the same way, courts in other circuits have ruled that a plan administrator's failure to consider opinions of treating providers indicates "the lack of a diligent and reasoned" benefits determination process.[38] Zoe's treating providers were in a position to accurately evaluate medical necessity of his treatments because they "knew her best."[39] Courts discount "for obvious reasons" the opinions of medical file reviewers who have not seen the patient.[40] In light of the

---

[33] *Id.*
[34] *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 467-468 (10th Cir. 1997).
[35] *Id.*
[36] *Rasenack*, 585 F.3d at 1325.
[37] *Id.* at 1326.
[38] *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 612 (6th Cir. 2016)
[39] *Javery v. Lucent Technologies, Inc. LTD Plan*, 741 F.3d 686, 702 (6th Cir. 2014)
[40] *Smith v. Bayer Corp. LTD Plan*, 257 Fed. Appx. 495, 508 (6th Cir. 2008) (citing *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228, 254-255 (S.D.N.Y. 2005))

facts and circumstances of Zoe's situation, RBCBSO's reliance on a "record review" only was inadequate.[41] "[I]n the context of a psychiatric evaluation, an opinion based on personal examination is inherently more reliable than an opinion based on a cold record because observation of the patient is critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis."[42]

RBCBSO relies on a psychiatric note from Dr. Bunn to validate its claim that Zoe was ready for discharge as of August 21, 2018.[43] But a review of that note confirms that Dr. Bunn continued to believe that Zoe was not ready for discharge, as she and her father continued to experience parent-child relationship problems and Zoe had difficulties with attachment. Those conditions would interfere with their ability to implement appropriate safety measures at a lower level of care. The conclusion to deny benefits also ignored the treatment log entry from three days earlier. On August 18, 2014, Zoe was still defiant, had a flat mood and was depressed.[44] On August 24, 2014, three days after the psychiatric note, Zoe went from nice to heated very quickly once she and her dad started to discuss Jake, a friend of Zoe's.[45]

A month later, the note from Dr. Bunn on September 18, 2014 confirmed that Zoe's emotions were still very guarded, and that her parent-child relationship and attachment problems continued. Since Zoe's dad was her support system, the criteria that required adequate support and safety planning at a lower level of care were not met. Two days earlier Zoe specifically identified the challenges with her father and her typical

---

[41] *Id.*
[42] *Westphal v. Eastman Kodak Co.,* No. 05-CV-6120, 2006 U.S. Dist. LEXIS 41494, at *14-15 (W.D.N.Y. June 21, 2006) (unpublished).
[43] Rec. 4073
[44] Rec. 4095-4096
[45] Rec. 1955

avoidance mechanism when dealing with him.[46] In the following days Zoe was picking at her skin until she would bleed, was rude and disrespectful, and struggled with her emotions.[47]  For Zoe, these seemingly common problems, without the support and structure that New Haven provided, would create the risk of suicide as a consequence to a poor parent child relationship, bad behavior, and poor emotional regulation. Zoe's behavior went beyond the silent treatment; her dangerous choices risked serious injury. Again, an assessment of the records and circumstances that RBCBSO relied upon to deny coverage during the relevant time frame demonstrated that it got the decision wrong.

   Part of the problem is reflected in RBCBSO's own notes from October 16, 2014.[48] The reviewer continued to focus on the suicidal ideation and self-harm components of the discharge guidelines. In so doing, RBCBSO lost sight of Zoe's father's inability to manage her behavior at a lower level of care. In fact the log notes from the day before discussed the challenges in the home relationship and Chuck's inability to validate Zoe's point of view.[49] The 10/16 note also came at a time when Zoe was looking forward to an excursion to Moab with her father.[50] But within two weeks and after a reportedly good trip to Moab,[51] Zoe was still very disruptive irritated, frustrated and emotionally dysregulated.[52] On November 2, she had a hard phone call with her dad that ended with her crying and confirming that her dad frustrated her.[53]

   On February 5, 2015, Chuck and Zoe's family therapy log illustrates how unprepared they were to engage in a meaningful safety plan in light of their strained

---

[46] Rec. 3912
[47] Rec. 1958, 3870, 1959, 3826, 3787, 3765.
[48] Rec. 308
[49] Rec. 3707
[50] Rec. 3695
[51] Rec. 3618
[52] Rec. 3461-3462
[53] Rec. 3597

relationship and communication problems. "Zoe and her father continued to create their value based rules and consequences. Zoe became more agitated as the discussion continued. When challenged to talk about what she was experiencing Zoe stated that she was 'fine.' Explored possible consequences to closed communication. Dad was repetitive when explaining rules and consequence and continued to reference Zoe's pre New Haven behavior."[54] Were they ready to work on follow-up treatment or implement a crisis plan? Was Chuck ready to be an adequate support? No. The Plan was not to discharge, rather, "continue to work on value based rules and consequences and invite Zoe and her dad to improve their communication."[55] Again the documentation confirms that Zoe and her father were unprepared for discharge to a lower level of care.

The final note referenced in the appeal/reconsideration document comes from November 6, 2014, and also refers to a letter from Dr. Bunn.[56] What the appeal/reconsideration notes omit from the letter is the following: "[Zoe] continued to display a pattern of severe impairment which demonstrated the clinical need for 24-hour structure, supervision and active treatment to prevent a continued deterioration of her condition and subsequent necessity of inpatient care if not in residential treatment. . . . Her admission was and is medically necessary."[57] RBCBSO's reviewers disagreed with Dr. Bunn but they were not in the position to accurately evaluate Zoe's medical needs that Dr. Bunn occupied.

Dr. Bunn and New Haven's clinical director, Sarah Engler, LCSW, confirmed these conclusions in a March 31, 2015 letter that indicated Zoe had failed to meet her treatment plan goals. Namely:

---

[54] Rec. 2919
[55] Rec. 2919
[56] Rec. 308
[57] Rec. 229

- ○ Zoe will be honest with her father and the staff at New Haven, and work through any secretive behaviors.
- ○ Zoe will look deeply at her self harming urges and understand the underlying core issues and emotions driving them.
- ○ Zoe will develop a comprehensive safety plan and will identify her triggers to be unsafe.
- ○ Zoe will practice impulse control when she is feeling depression, self harming urges (which include suicidal thoughts and substance use).
- ○ Zoe will report a reduction in oppositional thoughts and eliminate defiant behaviors.[58]

Because Zoe had failed to meet these treatment goals, she was not prepared to understand follow-up treatment and a crisis plan at a lower level of care. Nor would supports or a provider be available at a lower level of care. Finally, as a patient, Zoe could not be expected to participate in monitoring at a lower level of care. Curiously, RBCBSO claimed that it relied on Dr. Bunn's psychiatric note when it determined that Zoe was eligible for a lower level of care. In so doing, RBCBSO ignored his actual opinion that Zoe continued to need residential treatment.

In addition to these problems, Zoe needed residential treatment to address her substance abuse issues that symbiotically compounded her mental health problems. On September 3, 2014, New Haven staff noted that Zoe was struggling with substance abuse but not openly.[59] In February of 2015, she was defiant and used humor as a mask while engaging in drug talk.[60] More than six months after RBCBSO opined that Zoe was ready for discharge, Zoe was still struggling with understanding her substance abuse problems.[61] To the extent that RBCBSO provided no meaningful explanations or analysis regarding the interplay with substance abuse and her risk factors, its decision to deny coverage lacks credibility and should not be upheld.

---

[58] Rec. 1951-1952
[59] Rec. 3993
[60] Rec. 2936, 11482
[61] 2739, 2702

### B.   As Part of His Appeal, Chuck Provided Ample Evidence to Demonstrate Zoe's Ongoing Need for Residential Treatment and Coverage.

Chuck provided specific references to behaviors after August 21, 2014, through April of 2015, that indicated Zoe failed the criteria for discharge as indicated by the MCG criteria.[62] These behaviors were documented in treatment log entries and reflected the ongoing stress and miscommunications between Zoe and Chuck. The logs further reflected the emotional dysregulation that would interfere with Zoe being safe at a lower level of care. Because Zoe responds to emotional crises with thoughts and plans of suicide, a lower level of care would have placed her at great risk. Chuck provided evidence of Zoe's continued flat and tired affect, behaviors that were symptomatic of her ongoing risk for self-harm. Even in the residential facility, Zoe would pick at herself to the point of bleeding.[63] Zoe also found ways to engage in cutting while in treatment.[64] When she did process her feelings she would state that she felt demonic and her moods would shift rapidly during the day.[65] In February of 2015, through April of 2015, logs reflect that Zoe still struggled intensely with her emotions and especially with anger.[66] Any suggestion that Zoe should have been discharged to a lower level of care in August of 2014, against the backdrop of these reports runs contrary to the medical necessity required by the Plan.

### C.   Zoe's Treatment Providers Confirmed That Zoe Needed and Could Thrive in Residential Treatment.

As noted above, Dr. Bunn repeatedly confirmed the medical necessity for Zoe to remain in medical treatment. His opinions were supported by Zoe's long term therapist

---

[62] Rec. 1920-1922
[63] Rec. 1958, 3870
[64] Rec. 3456
[65] Rec. 1959
[66] Rec. 1921-1922

Amy W. Stoeber, Ph.D, who provided mental health care for Zoe for more than two years before Zoe went to New Haven. The discharge criteria required Zoe and her father to be ready to implement appropriate safety measures at a lower level of care before residential care ended. Dr. Stoeber verified the challenges that Zoe would have if she would have been discharged prematurely. "Zoe is difficult to engage in treatment and reluctant to engage in self-reflection and insight based therapy. Cognitive-behavioral therapy within a therapeutic relationship has proven most effective when she engages; but Zoe can be quite concrete and lack insight. She benefits from structure and consistency."[67] Dr. Stoeber identified many reasons why Zoe could make progress in a residential setting when she failed in lower levels of care.[68] "While Zoe is likeable and can be engaged at times in an outpatient setting, my clinical observations were that Zoe engaged about 20% of the time and utilized cognitive behavioral tools less than that outside of my office. She is a strong candidate for residential treatment because she benefits greatly from the structure without a chance of absconding. Also, when in residential treatment she is unable to disconnect from treatment through the use of drugs or alcohol."[69]

The analyses provided by Drs. Bunn and Stoeber reflect prudent clinical judgment as required by the plan. A recent case from North Carolina illustrates how insurers should evaluate improved patient behavior while the patient is still receiving residential treatment. The court opinion makes a strong case for the proposition that perceived stability does not always suggest discharge as the improvements can be attributed to the safety measure of the facility and the support measures the patient has while in care.[70]

---

[67] Rec. 226

[68] Rec. 226

[69] Rec. 226

[70] *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Emps.*, No. 5:15-CV-504-FL, 2017 2017 U.S. Dist. LEXIS 46377, at *11-13 (E.D.N.C. Mar. 29, 2017)

Short term improvements should not always result in a conclusion that the patient could

be safely treated in a lower level of care. The judge in *Wiwel* reasoned as follows:

> Finally, and most importantly, where the . . . [external review] opinion rests on its
> assessment that E.W.'s self-cutting behavior and thoughts of suicide were subdued by
> March 10, 2014, it fails entirely to address a conspicuous confounding variable, namely,
> the influence that La Europa [the residential treatment center at which the patient was
> treated], itself, may have brought to bear upon E.W.'s behavior. That is, where the
> evidence of record demonstrates that before her admission to La Europa, E.W.'s behavior
> was destructive, and while in residency at La Europa, E.W.'s behavior was stable, (see
> e.g., DE 32 at 391 (noting, among other things, E.W. denying suicide plan or intent as of
> February 28, 2014), the … [external review] opinion does not adequately state reasons to
> conclude that in the absence of La Europa's care, E.W.'s behavior would have remained
> stable after March 10, 2014.
>
> Relatedly, the … [external review] opinion fails to address trends evident in E.W.
> behavior over time. Specifically, before admission to La Europa, where E.W.'s symptoms
> progressed from difficulty concentrating, to depression, to self-cutting and suicidal
> ideation, the time-dependent arc of E.W.'s development was negative. (See DE 32 at 438
> (undisputed summary of E.W.'s behavior and treatment history)). While E.W. resided at
> La Europa, this trend reversed. … Nonetheless, in finding that E.W. safely could have
> left La Europa March 10, 2014, the … [external] reviewer offered no reasons to conclude
> that removing E.W. from the care of La Europa would not return E.W.'s progress to its
> prior dynamic of decline. … Thus, for the foregoing reasons, it is evident that defendant's
> decision to deny plaintiffs' application for benefits was not the result of a reasoned and
> principled decision making process as required by ERISA.[71]

Zoe had demonstrated over several years a regular pattern of declining behaviors with

increasing drug use that culminated in a suicide attempt and ongoing threats to commit suicide.[72]

Continued outpatient treatment would have allowed that cycle to continue. When RBCBSO

suggested a lower level of care by identifying particular improvements in Zoe's behavior but

overlooked her other challenges, it ignored the critical role the treatment center provided in her

safety. While the record showed that Zoe continued to have struggles, she also improved. Had

she not shown signs of improvement, the treatment might not have met the medical necessity for

ongoing treatment. As with the precedent that guided the district court in *Wiwel*, the Tenth

---

[71] *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Emps.*, 2017 U.S. Dist. LEXIS
46377, at *11-13 (E.D.N.C. 2017)
[72] Rec.174-176, 237, 259-261, 449-455

Circuit also requires that ERISA plan administrators engage in a "reasoned and principled process" as part of its fiduciary duties in deciding whether a plan participant is entitled to benefits.[73] RBCBSO failed to do that in this case.

Notably one part of the Plan evaluates the health outcome as a question of the length or quality of a person's life. The health intervention or treatment overall effects on health must outweigh any harmful effects.[74] Here, the treatment team at New Haven had to weigh the risk of suicide and self-harm against the challenges of life in a residential treatment center. Although Zoe's treatment at New Haven meant distance from her father and changes in her normal routine, the benefits of residential treatment as outlined by Zoe's treatment providers outweighed any negative consequences.

### D. RBCBSO's final denial letter reveals that it knew Zoe did not meet all of the discharge criteria.

In its final denial letter, RBCBSO identified all of the other discharge criteria, but remarkably it omitted any mention of each of three of the six required risk factors.[75] The denial letter states:

> The rationale for this decision is as follows: "Per the submitted MCG, the criteria for discharge from residential acute behavioral health level of care include the following: no recent suicide attempt or act of serious harm to self; no thoughts of suicide, homicide, or thoughts or intent to harm oneself or others; no impairment of essential functions; no adverse medication effects are absent or manageable; medical comorbidities are manageable; and substance withdrawal is absent or manageable . As mentioned above, the patient had met all of these criteria by the date of 8/22/14. Therefore, based on the submitted guidelines and clinical information provided, medical necessity has not been established for additional dates of service in residential acute behavioral health level of care after 8/22/14 in this patient's case."[76]

---

[73] *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007)
[74] Rec. 91
[75] Rec. 1868
[76] Rec. 1868

The only requirements that RBCBSO failed to include in its denial letter are the criteria that Zoe did not meet. Compounding the error, the reviewer only wrote the word MET if a provision was satisfied. The failure of an insurer to observe and decide claims based on the express language of the ERISA plan requires reversal of the insurer's denial of that claim.[77] Chuck and Zoe have met their burden to show that Zoe qualified for ongoing residential treatment until her discharge. Because RBCBSO cannot point to persuasive evidence in the record that suggests Zoe and her father were prepared for discharge, its decision to terminate coverage in August, 2014, was wrong and should be reversed.

## V.       DAVID IS ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS.

In the event that the Court grants Chuck and Zoe's Motion for Summary Judgment, they request an award of attorney fees and costs based on 29 U.S.C. §1132(g) as the prevailing party in this litigation. The Plaintiffs request the opportunity to present in future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate.

## CONCLUSION

RBCBSO actually provides the road map that is needed to naturally reach the conclusion that Zoe continued to require residential treatment after August 21, 2014. That conclusion flowed naturally from the lengthy history of troubled behavior and unhealthy parent child relationships. That conclusion was further supported by the very logs that RBCBSO and the contemporary treatment report to verify Zoe's struggles with her

---

[77] *Owings v. United of Omaha Life Ins. Co.,* 873 F.3d 1206, 1214-1215 (10th Cir. 2017); *Van Steen v. Life Ins. Co. of North America,* 878 F.3d 994, 1000 (10th Cir. 2018) (reversing an insurer's claim denial because it could not "ignore the language of the Plan itself").

treatment goals. Chuck's appeal spelled out the repeated and ongoing challenges that would have made a step down to a lower level of care impossible without risking the well-being of Zoe. Finally, both Zoe's previous and her then current treatment team confirmed the need for ongoing residential treatment, as outpatient treatment was much less effective and provided Zoe with the risk of sabotaging her progress, as had happened before in her treatment. Fortunately, Zoe remained at New Haven and received the care she needed. Now RBCBSO should compensate Chuck for the costs he had to bear to make sure his daughter received that essential treatment. By granting Chuck and Zoe's petition and granting all the relief they seek, this Court will validate the Plan as it was written and intended by the parties.

Dated: December 20, 2018

s/    Brian S. King

Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been delivered via the Court's electronic filing and case management system to counsel for the Defendant as identified on the court's ECF filing system.

DATED this 20th day of December, 2018.

s/ Brian S. King