IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHARLES W. and ZOE W.,<br><br>Plaintiffs,<br><br>vs.<br><br>REGENCE BLUECROSS BLUESHIELD OF OREGON,<br><br>Defendant. | ORDER<br><br>Case No. 2:17-cv-00824-TC |

Plaintiff Charles W. (Chuck)[1] was insured by Defendant Regence BlueCross BlueShield of Oregon (Regence). Chuck's daughter, Plaintiff Zoe W., was a covered dependent. On June 11, 2014, Zoe was admitted to an inpatient mental health program at New Haven Residential Treatment Center (New Haven) in Spanish Fork, Utah. Regence initially declined to pay for this treatment. Later, after Chuck appealed the denial, Regence agreed to pay for the treatment from June 11 to August 21 but refused to pay for any treatment beyond that period. Ultimately, Zoe remained at New Haven from June 2014 to June 2015.

Following a second appeal, Regence upheld its denial of benefits beyond August 21. Plaintiffs filed this action on July 20, 2017. They argue Regence was obligated to cover Zoe's

---

[1] The parties refer to Charles W. as "Chuck" in the papers, so for convenience, the court does so as well.

treatment for the duration of her stay at New Haven.  The parties have filed cross-motions for summary judgment to resolve this dispute.  (See ECF Nos. 27-28.)  For the reasons stated below, Plaintiffs' motion is granted, and Regence's motion is denied.

## I.      ADMINISTRATIVE RECORD

A.  Zoe's Treatment

Chuck and Zoe's mother divorced when Zoe was two years old.  (Administrative Record (AR) 174.)  Zoe lived with her mother for four years, until her mother died of ovarian cancer. She then began to live with her father.  (AR 174.)

In 2013, Zoe attempted suicide, and was hospitalized for two weeks at the Portland Providence Medical Center, followed by four weeks of inpatient residential treatment at the Children's Farm Home.  (AR 175.)  After her discharge, she began using drugs.  (AR 175.)  She also engaged in self-harm and made additional suicide attempts, leading Chuck to admit Zoe to New Haven on June 11, 2014.  (AR 168.)

On June 18, Regence contacted New Haven to discuss the types of services they offered. (AR 13730.)  Regence also "asked about [the] typical length of stay" and informed New Haven that the Milliman Care Guidelines ("MCG"), which Regence relied on to evaluate mental health treatment claims, "expects most [patients] can meet treatment goals within 30 days."  (AR 13730.)  Then, on June 19, Regence informed Chuck that it would not be covering the costs of treatment because New Haven "does not provide the necessary intensity of service for coverage of mental health residential treatment."  (AR 182.)

While at New Haven, Zoe was evaluated by psychiatrist William Bunn about once a month.  For example, on June 26, 2014, Dr. Bunn recorded that "[Zoe] reports that she has been

doing 'OK' and has been stable. She is getting to know the girls and staff and feels comfortable with the treatment. She denies any depressive symptoms—feels like her medications are working and not interested in any changes at this time." (AR 1733.) Dr. Bunn's July notes state, "[Zoe] seems to be doing well, mood has been stable, denies depression, [but] also seems to be avoiding per staff. She claims she just likes to be alone in her room where it is quiet. She is working hard in therapy. No other concerns." (AR 1590.) On August 21, Dr. Bunn noted that "[Zoe] has struggled a bit—passive resistance to treatment, staff and therapist pushing her to work on her issues. She underreports her emotions." But Zoe had agreed to begin reducing one of her medications, Wellbutrin. (AR 1337.) On September 18, Dr. Bunn wrote that Zoe "says her mood is OK, and she hasn't had any self-harm issues or desires. Seems to be working hard in her therapy, still very guarded regarding her expression of emotions." (AR 1169.) In October, Zoe was "doing OK." She told Dr. Bunn that "she constantly feels like she is in a dreamstate or there is a thick paine [sic] of glass in front of her view." They discussed whether to decrease her medications, but Zoe "still want[ed] to take the Zoloft [because she was] afraid of getting depressed." (AR 972.) And at his November 6 evaluation, Dr. Bunn noted that Zoe "seems to be about baseline." Zoe agreed to try decreasing her medication, "with the understanding if she gets depressed we will go back on the medication." (AR 849.)

At each of these sessions, Dr. Bunn also reported that Zoe had no suicidal or homicidal ideation.

While Zoe was at New Haven, the facility staff completed approximately five or six observation reports regarding Zoe every day. These reports discuss her schoolwork, her physical health, how much or how little she was sleeping, whether she was engaged during group therapy

sessions, the extent of her participation in fieldtrips and community activities, and whether she was making progress in family therapy with Chuck. The reports indicate Zoe's mood, progress, and mental health all had ups and downs while at New Haven.[2] But one note in particular must be flagged. On November 21, 2014, the staff raised concerns that Zoe had again engaged in self-harm: "[Zoe] had signs of self-harm [that] another staff notice[d]. Staff searched her room and found a pencil sharpener without a blade that had pencil shaving inside. Staff could not find the blade anywhere. Also found interesting letters and notes that may have caused the action." (AR 740.)

Zoe was discharged from New Haven on June 15, 2015, "having successfully completed the program." (AR 1977, 1980.)

B. First Appeal to Regence

On December 10, 2014, Chuck appealed Regence's decision to deny coverage for Zoe's stay at New Haven. (AR 168.) In support, he submitted the records from New Haven and Dr. Bunn regarding Zoe's first six months in the program. He also provided letters from Dr. Bunn and from Dr. Amy Stoeber, who had been Zoe's treating psychologist before she entered New Haven.

Dr. Stoeber stated that Zoe had exhibited symptoms of Major Depressive Disorder, Social Phobia, Attachment Disorder, and possibly an Axis II Personality Disorder before entering New Haven. (AR 226.) Dr. Stoeber also stated that she believed Zoe would benefit more from residential treatment than from outpatient treatment:

---

[2] These records consist of over 1000 pages, from AR 637 to 1840. The court has reviewed each excerpt specifically cited by the parties in their briefs but does not repeat them here. The court additionally reviewed, in detail, AR 1231-1437, because those records specifically cover the key time period in which Regence concluded treatment was no longer necessary. Specific excerpts from those records are included below as part of the court's analysis.

. . . [Zoe] is a strong candidate for residential treatment because she benefits greatly from the structure without a chance of absconding. Also, when in residential treatment, she is unable to disconnect from treatment through the use of drugs or alcohol.

. . . I do not believe she will benefit from outpatient therapy until she has a significant amount of . . . time in residential treatment to gain stability on medication, therapy, and gain further insight.

(AR 226.)

Separately, Dr. Bunn wrote:

[Zoe's] diagnosis at the time of admission was Depression, Unspecified, Cannabis Use Disorder, Borderline Personality Disorder Features, Parent-Child Relationship Problems, [and] Difficulties with Attachment. Currently she continues to display many depressive symptoms: low energy, excessive sleep, isolation from others in the community, feeling hopeless, and anhedonia.

She continued to display a pattern of severe impairment which demonstrated the clinical need for 24-hour structure, supervision, and active treatment to prevent a continued deterioration of her condition and subsequent necessity of inpatient care if not in residential treatment. It was felt by her treatment team prior to this admission that a lesser restrictive environment would not be able to provide the level of care she needed. Her admission was and is medically necessary.

(AR 229.)

Regence submitted Zoe's records to Dr. Diane Stein for review. Dr. Stein evaluated the records based on the MCG, 18th Edition, Residential Acute Behavioral Health Level of Care, Child or Adolescent. (AR 309.) Based on the MCG, Dr. Stein determined that it was medically necessary for Zoe to be admitted to New Haven in June 2014. (AR 309.) But she also concluded that, by August 21, 2014, Zoe had met all of the requirements to be discharged from residential treatment. (AR 309-10.) Dr. Stein wrote, "As of 8-21-14, [Zoe] was sufficiently stable, with good response to medication taper to step down to [Partial Hospitalization Program (PHP) level of care], and she met [the discharge] criteria." (AR 311.)

Based on Dr. Stein's conclusions, on January 13, 2015, Regence informed Chuck that it was partially reversing its decision to refuse coverage for Zoe, and would cover her treatment from June 11, 2014, to August 21, 2014. (AR 18553.) But it maintained that it would provide no coverage after that date. (AR 1853.)

C. Second Appeal to Regence

On July 9, 2015, Chuck appealed for the second time. (AR 6167.) In support, Chuck provided an additional letter from Dr. Bunn, jointly signed by Sarah Engler, the clinical director of New Haven. They wrote:

> Zoe's insurance covered [treatment] until August 2014. At that time she had not met [her] treatment goals and it was not medically indicated for her to be released. She was still exhibiting self-harm tendencies, was still very depressed and unmotivated. . . . Most importantly, at that time, she continued to express feelings of hopelessness and frustration, despite medication changes and trials.
>
> Because of the above, it was felt that she continued to display a pattern of severe impairment which demonstrated the need for 24-hour structure, supervision, and active treatment to prevent a continued deterioration of her condition and subsequent necessity of inpatient care if not in residential treatment. The treatment team continued to feel that admission to a less-restrictive environment would not be able to provide the level of care she needed. Her admission continued to be medically necessary.

(AR 1952.)

Regence then asked an independent entity, AllMed Healthcare Management, to review the records. (AR 1863.) Their reviewer, Dr. Kenneth Marks, concluded:

> [A]s of 8/22/14, the patient was not suicidal, there were no thoughts or attempts at suicide or self-harm, there was no functional impairment, and she was able to complete her activities of daily living. Therefore, she could continue to receive her care at a lower level of care. She has no medical problems, nor were there any concerns regarding medication side-effects, and she had no current substance abuse problem.

> Per the submitted MCG, the criteria for discharge from residential acute behavioral health level of care include the following: no recent suicide attempt or act of serious harm to self; no thoughts of suicide, homicide, or thoughts or intent to harm oneself or others; no impairment of essential functions; no adverse medication effects are absent or manageable (sic); medical comorbidities are manageable; and substance withdrawal is absent or manageable. As mentioned above, the patient had met all of these criteria by the date of 8/22/14. Therefore, based on the submitted guidelines and clinical information provided, medical necessity has not been established for additional dates of service in residential acute behavioral health level of care after 8/22/14 in this patient's case.

(AR 1873.)

The Dr. Stein review and the Dr. Marks review were both submitted to Regence's Member Appeal Panel. (AR 1902.) The Panel concurred with the reviewers' findings, and accordingly, Regence denied the second appeal on August 7, 2015. (AR 1867.)

## II. STANDARD OF REVIEW

"A denial of benefits under an ERISA plan 'is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 825 (10th Cir. 2008) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). In applying de novo review, "the standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." Niles v. American Airlines, Inc., 269 F. App'x 827, 833 (10th Cir. 2008). The burden is on the insured to prove an entitlement to benefits. Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1319 (10th Cir. 2009).

Here, the parties agree that the court should review the denial of benefits de novo.

**III.  ANALYSIS**

A.  <u>Applicability of MCG</u>

Chuck's plan covers inpatient or outpatient mental health services if they are "medically

necessary."  (AR 040.)  The policy defines medically necessary as:

> [H]ealth care services or supplies that a [p]hysician or other health care
> [p]rovider, exercising prudent clinical judgment, would provide to a patient for
> purpose of preventing, evaluating, diagnosing or treating an illness, [i]njury,
> disease or its symptoms, and that are:
> - in accordance with generally accepted standards of medical practice;
> - clinically appropriate, in terms of type, frequency, extent, site and duration,
>   and considered effective for the patient's [i]llness, [i]njury or disease; and
> - not primarily for the convenience of the patient, [p]hysician or other health
>   care [p]rovider, and not more costly than an alternative service or sequence of
>   services or supply at least as likely to produce equivalent therapeutic or
>   diagnostic results as to the diagnosis or treatment of that patient's [i]llness,
>   [i]njury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means
> standards that are based on credible Scientific Evidence published in Peer-
> Reviewed Medical Literature generally recognized by the relevant medical
> community, Physician Specialty Society recommendations and the views of
> [p]hysicians and other health care [p]roviders practicing in relevant clinical areas
> and any other relevant factors.

(AR 092.)

In determining whether Zoe's treatment was medically necessary, Regence and each of

its reviewers relied on the MCG.[3]  The MCG define both when inpatient mental health care

services are appropriate (AR 1889-90) and when a patient should be discharged.  The MCG

state, in part, that inpatient care is no longer necessary when:

> Risk status [is] acceptable as indicated by ALL of the following;

---

[3] "To determine whether a person needs inpatient or outpatient care, most hospitals use one of two systems: the InterQual Criteria or the Milliman Care Guidelines.  Both were developed by independent companies with no financial interest in admitting more inpatients than outpatients. . . .  [T]he Milliman Guidelines were written and reviewed by over 100 doctors and reference 15,000 medical sources. . . .  [A]bout 1,000 [hospitals] use Milliman." <u>Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.</u>, 877 F.3d 687, 690 (6th Cir. 2017).

- Patient has not recently made a [s]uicide attempt or act of serious [h]arm to self, or has had [s]ufficient relief of precipitants of any such action.
- Absence of [c]urrent plan for suicide or serious [h]arm to self for at least 24 hours.
- Thoughts of suicide, homicide, or serious [h]arm to self or to another are absent or manageable at available lower level of care.
- Supports, and patient as appropriate, understand follow-up treatment and crisis plan.
- Provider and supports are sufficiently available as needed in monitoring at next level of care.
- Patient, as appropriate, can participate as needed in monitoring at next level of care.

(AR 1891 (emphasis in original).)

Plaintiffs contend that the MCG were not actually the appropriate standard to assess Zoe's fitness for discharge because the type of inpatient care addressed by the MCG is acute or emergency inpatient hospitalization, not long-term, sub-acute residency programs like New Haven. Plaintiffs' argument is based largely on findings made in H.N. v. Regence BlueShield, Case No. 15-cv-1374 RAJ, 2016 WL 7426496 (W.D. Wash. Dec. 23, 2016), another case in which Regence refused to pay for a patient's treatment at New Haven. The H.N. court criticized Regence for relying exclusively on the MCG in making its determinations:

The MCG might be a helpful tool but were not intended to operate as a sole basis for denying treatment or payment. The MCG are to be applied to individual patients on a case-by-case basis and always in the context of a qualified healthcare professional's clinical judgment. . . .

Though the MCG are recognized by physicians and hospitals, they are "by no means the sole measure of medical necessity."

Id. at *4. The court also noted that the MCG seemed particularly inapplicable to New Haven:

New Haven is a non-acute [Residential Treatment Center (RTC)]. REG 3447. A non-acute RTC typically treats patients for a longer duration and has less emphasis on constant safety monitoring than an acute facility. Id. "Peer-reviewed scientific studies have shown that for patients with persistent behavioral

9

disorders that have not responded to outpatient therapy, long-term non-acute RTCs provide highly effective treatment." Id. The industry standards for non-acute RTCs differ from those of acute RTCs. . . .

The MCG, however, only account for residential acute levels of treatment. See, e.g., REG 3770. With that said, the MCG cite to an article describing the different levels of care for children and adolescents, including the residential treatment level. REG 3793. The article states that residential treatment typically lasts from six months to several years. Id.

Id. at *7-8.

Regence urges the court to disregard the H.N. case because it is based on a different administrative record. While this is true, Regence provides no compelling reason why the H.N. court's findings about the services provided by New Haven, and the applicability of the MCG to those services, would not be equally applicable to this case; those conclusions appear applicable to any record.

Regence also claims that "in its Findings of Fact, the H.N. court found that '[t]here is no guideline for treatment for non-acute residential treatment levels of care.'" (ECF No. 40 at 10.) This argument relies on an exceedingly misleading excerpt from H.N. The actual quote, in context, is: "Regence utilized the 17th Edition of the MCG when reviewing H.N.'s claims. This edition includes guidelines for inpatient behavioral health treatment levels of care and residential acute behavioral health treatment levels of care. There is no guideline for non-acute residential treatment levels of care." H.N., 2016 WL 7426496 at *7. In context, the H.N. court was clearly stating that the MCG itself does not contain guidelines for non-acute care; not that no such guidelines exist anywhere.

Finally, Regence cites other cases where the MCG were found to be the appropriate standard for determining benefits to argue that it acted properly in relying on the MCG here. But

the decisions cited by Regence all relate to entirely different medical conditions. See Becker v. Chrysler LLC Health Care Benefits Plan, 691 F.3d 879 (7th Cir. 2012) (applying the MCG to residential elder nursing care); Stiltz v. Humana, Inc., Civil Action No. 3:10-CV-02088-M, 2011 WL 3510898 (N.D. Tex. Aug. 9, 2011) (applying the MCG to lumbar fusion treatments); Clendenen v. Health Care Serv. Corp., Civil No. 10-2217 ADM/FLN, 2011 WL 1429212 (D. Minn. April 14, 2011) (applying the MCG to inpatient rehabilitation following a paralyzing stroke). These cases are irrelevant: Plaintiffs are not arguing that the MCG never apply or are medically unsound. They are arguing only that they are inapplicable to this situation. On this question, only the H.N. case is directly on point, and it concluded the MCG were not applicable. The court here reaches the same conclusion.

Regence is correct in noting that Plaintiffs do not explain what alternative objective standards should have been used by Regence, if not the MCG. But providing such an alternative is not necessary for Plaintiffs' argument to succeed. The definition of "generally accepted standards of medical practice," as used in the policy, includes "credible Scientific Evidence published in Peer-Reviewed Medical Literature . . . and the views of [p]hysicians and other health care [p]roviders practicing in relevant clinical areas." (AR 092 (emphasis added).) So despite Regence's argument to the contrary, Dr. Bunn, a practicing psychiatrist, was not required to identify an objective, peer-reviewed article to support his conclusions that Zoe's treatment was medically necessary. Rather, Dr. Bunn's conclusions are entitled to weight under the definition of the plan because they come from an expert practitioner in the relevant field.[4]

---

[4] The court does not here suggest that Dr. Bunn's views are entitled to special deference by virtue of being a treating physician. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Rather, the court notes only that under the plan, "generally accepted standards of medical practice" can be determined by considering "the views of physicians . . . practicing in relevant clinical areas," a category that includes Dr. Bunn.

By contrast, Dr. Stein's and Dr. Marks's conclusions were based not on their personal observations of Zoe or on their general subject matter expertise, but on their application of a specific standard supplied by Regence to a set of facts. Plaintiffs have shown that, under <u>H.N.</u>, this standard was inapplicable, so Dr. Stein's and Dr. Marks's conclusions do not accurately assess medical necessity as that term is defined under the plan.

Plaintiffs' burden is to show by a preponderance of the evidence that Zoe's treatment was medically necessary. <u>See</u> <u>Niles</u>, 269 F. App'x at 833. Dr. Bunn believed Zoe's continued treatment at New Haven was medically necessary; Dr. Stein and Dr. Marks said it was unnecessary. Dr. Bunn's conclusion falls within the plan's definition of generally accepted standards of medical practice, while Dr. Stein's and Dr. Marks's views, cabined as they were by the MCG, do not. Based on this, Plaintiffs have carried their burden.

B. <u>Findings Under the MCG</u>

1. Evidence of Medical Necessity

In any event, even assuming the MCG are applicable and that Dr. Stein's and Dr. Marks's opinions are entitled to full consideration, the court concludes these reviewers did not apply the MCG properly.

Dr. Stein's review of Zoe's records is quite straightforward: she simply summarized the records, reproduced the text of the MCG, and then wrote "Met" next to each discharge criteria. She did not explain why she believed all of these criteria had been met, other than by writing, "As of 8-21-14, [patient] was sufficiently stable, with good response to medication taper to step down to PHP [level of care], and she met [the discharge] criteria." (AR 307-311.)

Dr. Marks's report was similarly brief. He noted, "[A]s of 8/22/14, the patient was not suicidal, there were no thoughts or attempts at suicide or self-harm, there was no functional impairment, and she was able to complete her activities of daily living. Therefore, she could continue to receive her care at a lower level of care." He also wrote:

> Per the submitted MCG, the criteria for discharge from residential acute behavioral health level of care include the following: no recent suicide attempt or act of serious harm to self; no thoughts of suicide, homicide, or thoughts or intent to harm oneself or others; no impairment of essential functions; no adverse medication effects are absent or manageable; medical comorbidities are manageable; and substance withdrawal is absent or manageable. As mentioned above, the patient had met all of these criteria by the date of 8/22/14.

(AR 1873.)

Neither report provides a satisfactory basis to conclude Zoe's treatment was no longer medically necessary under the MCG. The MCG lay out six elements that must be satisfied before discharge is appropriate: (1) No recent suicide attempts or self-harm; (2) No plan for suicide or self-harm in last 24 hours; (3) Thoughts of suicide or self-harm are absent or manageable at a lower level of care; (4) The patient's support network understands the new treatment and has a crisis plan; (5) Health care providers and the patient's support network are available to monitor patient; and (6) The patient can participate in monitoring at a lower level of care.

Regence's reviewers did not sufficiently address the fourth, fifth, or sixth elements.

Dr. Stein indicates that each of these elements are "met," but does not explain why she reached that conclusion. The court is particularly concerned by the lack of findings regarding the role of Zoe's support network. The only realistic support identified in the records is Zoe's father, with whom Zoe had a difficult relationship. On August 13, Zoe and Chuck participated in family

therapy. Zoe indicated she was uncomfortable sharing her emotions with Chuck, and Chuck "struggled to validate" Zoe's opinions, "trying to use reason to have her change her perspective." (AR 1397.) And on September 6, Zoe indicated to a therapist that she had little desire to improve her relationship with her father. (AR 1242.) Yet Dr. Stein never addresses whether Zoe's father has the capacity to support Zoe if she were treated at a lower level of care.

On the contrary, in finding that admitting Zoe to New Haven was originally medically necessary, Dr. Stein conceded there were concerns in this area. She reproduced the MCG criteria for admitting patients to inpatient treatment, and next to two relevant criteria—"Severe conflict in family environment or other inadequacy in patient support system is present" and "A high level of family conflict is present"—Dr. Stein wrote "met." Dr. Stein does not explain how Chuck and Zoe's relationship had changed by August 21 to warrant finding these issues were no longer a concern. Cf Dominic W. on behalf of Sofia W. v. N. Trust Co. Emp. Welfare Benefit Plan, Case No. 18 C 327, 2019 WL 2576558 at *7 (N.D. Ill. June 24, 2019) ("Dr. Qadir's opinion fails to cite new, medically relevant information that would reasonably justify reversing the benefits decision Blue Cross made just two weeks prior."). Nothing in the records support a finding that this situation had changed such that Chuck was prepared to support Zoe if she was treated at a lower level of care.

Even more egregiously, Dr. Marks explicitly listed the reasons he believed further treatment was unnecessary—no recent suicide attempts, no thoughts of suicide, no concerns with medication or substance abuse—but never said anything about Zoe's support network. At least Dr. Stein listed all six of the MCG elements; Dr. Marks skipped half of them.

At the hearing, counsel for Regence suggested it could be inferred that, if placed in a PHP, Zoe would be supported by medical professionals and would have a crisis plan in place. Regence argues the court can infer from this that it considered the fourth, fifth, and sixth elements, even though they were ignored by Dr. Marks and unexamined by Dr. Stein. But this inference is not supported by the record. PHP is never defined; what it would entail was never communicated to Chuck or Zoe. Among other things, to meet the standard of medical necessity under the plan, a treatment must "not [be] more costly than an alternative service" and must be "at least as likely to produce equivalent therapeutic or diagnostic results" as other options. The records do not address the cost of PHP. And because it is never defined, the record does not explain whether it would be as effective as residential treatment.[5] From this vacant record, the court cannot simply infer that a PHP recommendation satisfies the three elements of the MCG that were not addressed by Dr. Stein or Dr. Marks.

The court also concludes the reviewers did not make sufficient findings about the third element, which asks whether Zoe's thoughts regarding self-harm would be manageable at a

---

[5] At the hearing, counsel for Plaintiffs suggested that the court might find it useful to review the definition of PHP used in <u>Wit v. United Behavioral Health</u>, Case No. 14-cv-02346, 2019 WL 1033730 (N.D. Cal. March 05, 2019). There, the court explained:

> While partial hospitalization does not involve the 24-hour structure of residential treatment (and in that sense, is a lower level of care), it differs from residential treatment (and is more like inpatient hospitalization) in that it is an acute, crisis-focused level of care. Trial Tr. 488:13-17 (Plakun) ("[PHP is] generally focused on crisis stabilization, crisis intervention, in a way that's similar to the way inpatient hospitals are and usually limited in duration with an eye, again, toward stabilizing the crisis and returning someone to a lower level of care."); see also Trial Ex. 656-0031 (CMS Manual) ("Patients admitted to a PHP generally have an acute onset or decompensation of a covered Axis I mental disorder."). PHP treatment provides approximately 20 hours per week of treatment services.

<u>Id.</u> at *17. Accepting this as a standard definition of PHP, the court concludes PHP is meant to address a fundamentally different problem than New Haven was trying to address with Zoe (as PHP is more geared toward crisis stabilization, not long-term changes in behavior). Accordingly, the court doubts that PHP was an appropriate alternative for Zoe's care.

lower level of care. While Dr. Stein and Dr. Marks focused only on Zoe's then-existing medical

status, Dr. Bunn's recommendations accounted for her condition before entering New Haven and

warned of the likelihood that leaving New Haven would cause backsliding. (AR 229, 1951-52.)

This is another key issue ignored by Dr. Stein and Dr. Marks.

In Wiwel v. IBM Medical and Dental Benefit Plans for Regular Full-Time and Part-Time

Employees, No. 5:15-cv-504-FL, 2018 WL 526988 (E.D.N.C. Jan. 18, 2018), the court

concluded the insurer's denial of benefits was erroneous (even under the more stringent abuse of

discretion standard) because the insurer's reviewers had failed to evaluate whether improvements

in the patient's depression would last if she was removed from residential treatment:

> [W]here the [reviewer's] opinion rests on its assessment that E.W.'s self-cutting
> behavior and thoughts of suicide were subdued by March 10, 2014, it fails
> entirely to address a conspicuous confounding variable, namely, the influence that
> La Europa [the residency facility], itself, may have brought to bear upon E.W.'s
> behavior. That is, where the evidence of record demonstrates that before her
> admission to La Europa, E.W.'s behavior was destructive, and while in residency
> at La Europa, E.W.'s behavior was stable, . . . the [reviewer's] opinion does not
> adequately state reasons to conclude that in the absence of La Europa's care,
> E.W.'s behavior would have remained stable after March 10, 2014.
>
> Relatedly, the [reviewer's] opinion fails to address trends evident in E.W.
> behavior over time. Specifically, before admission to La Europa, where E.W.'s
> symptoms progressed from difficulty concentrating, to depression, to self-cutting
> and suicidal ideation, the time-dependant [sic] arc of E.W.'s development was
> negative. (See DE 32 at 438 (undisputed summary of E.W.'s behavior and
> treatment history)). While E.W. resided at La Europa, this trend reversed. (See
> id. at 391). Nonetheless, in finding that E.W. safely could have left La Europa
> March 10, 2014, the . . . reviewer offered no reasons to conclude that removing
> E.W. from the care of La Europa would not return E.W.'s progress to its prior
> dynamic of decline. (DE 34 at 473–76). Thus, for the foregoing reasons, it is
> evident that defendant's decision to deny plaintiffs' application for benefits was
> not the result of a reasoned and principled decisionmaking process as required by
> ERISA.

Id. at *4-5.

Dr. Stoeber detailed the self-harm Zoe had engaged in before entering New Haven, and why she thought such practices would return if she was not in residential treatment.[6] (AR 226.) Dr. Bunn also warned that these tendencies could return if Zoe was released prematurely. (AR 1952.) But Dr. Stein and Dr. Marks did not address this possibility. They concluded that Zoe's condition as of August 21, 2014, was stable, but the MCG require not only a finding of present stability, but a finding that she will remain manageably stable if discharged to a lower level of care. Because Regence's reviewers did not appropriately consider the extent to which Zoe's stability was attributable to New Haven or explain why it would not get worse if she left New Haven, Plaintiffs' have demonstrated by a preponderance of the evidence that Zoe's treatment at New Haven was medically necessary.

    2. Arbitrary Date

    As additional evidence that Regence's decision was unsupported by the record, the court notes that Regence's selection of August 21, 2014, as the last date for which benefits would be paid appears to be entirely arbitrary. The only significant thing to occur on that date was that Dr. Bunn evaluated Zoe. His notes indicate, "Patient has struggled a bit—passive resistance to treatment, staff and therapist pushing her to work on her issues. She underreports her emotions, but is willing to reduce the Wellbutrin." (AR 1337.) But these notes are analogous to Dr. Bunn's findings when he evaluated Zoe on June 26, 2014 (AR 1733), July 17, 2014 (AR 1590), September 18, 2014 (AR 1169), October 16, 2014 (AR 972), and November 6, 2014 (AR 849). Over the course of six months, Dr. Bunn consistently concluded, essentially, that Zoe was doing

---

[6] Regence argues Dr. Stoeber's letter should be disregarded because she had no firsthand knowledge of Zoe's condition while she was at New Haven. The court agrees that Dr. Stoeber was not qualified to testify regarding the benefits of New Haven for Zoe, but she was qualified, based on her earlier work with Zoe, to opine that outpatient treatments would likely be more unsuccessful than residential treatments.

okay—not suicidal, sometimes in a good mood, sometimes in a bad mood, generally concerned about depression but not experiencing particularly severe depression. There was nothing particularly unique about the August 21, 2014 visit, as opposed to the other visits, and it frankly appears as though Dr. Stein selected it at random as the date from which treatment was no longer medically necessary.

A review of the records from New Haven further demonstrates the arbitrariness of this date. In the two weeks before August 21, New Haven staffers completed five or six observation notes of Zoe each day. Many days were good: Zoe took a "huge step" by "tak[ing] ownership" of her mistakes (AR 1437); indicated she wanted to someday go to college to become successful (AR 1412); and was "in a really good mood" and was "very social." (AR 1369.) A few days later, she was again "in a really good mood," and was "doing a better job interacting with the community." (AR 1365.) Shortly after that, she was described as "in a relatively positive mood." (AR 1352.) On August 20, Zoe "did not seem to act depressed today. She used her humor to cheer up" another resident. (AR 1345.)

But just as frequently, Zoe had bad days: She said she went back and forth between panic attacks, when her emotions overwhelmed her, and feeling nothing, as though "she went through much of life in a 'fog.'" (AR 1441.) She was "guarded and irritable" (AR 1425) or was "having a problem with meeting basic expectations" and was "pushing boundaries" (AR 1405). She stated that she did not want to share her emotions with her father. (AR 1397.) One day, she isolated herself, and indicated she was "feeling a lot of emotion, but doesn't know how to get it out." (AR 1391.) On August 15, she "appear[ed] to be doing the bare minimum of what's expected of her . . . [She] asked staff what would happen if a [student] refused to eat. She ate less

than half of her meal served." (AR 1379.) Another day, she "seemed to be struggling with her depression," and the staff wondered if she had accessed drugs because she "seemed like she could have been suffering from withdrawals." (AR 1376.) A few days later, she mentioned that she "struggled with feeling purpose and meaning." (AR 1339.) She "talked about how she had a really hard time in recovery group . . . and she's working on overcoming an addiction that nobody . . . can understand." (AR 1336.)

The two weeks after August 21 were no different. On the positive side, staff recorded that "[t]hough [Zoe] seemed to have irritable moments, she seemed to have an overall happy disposition throughout the day." (AR 1331.) Zoe took the initiative in setting a goal to be less disrespectful. (AR 1327.) A few days later, staff recorded that Zoe was in a cheerful mood. (AR 1322.) She "[d]idn't seem to be struggling too much with her depression tonight. She actually seemed to be a little more upbeat." (AR 1302.) On August 30, Zoe handled a confrontation with another girl in a mature way, and Zoe was proud of herself. (AR 1287.) On September 4, staff recorded that Zoe "was respectful to staff today. . . . [O]verall [she] seemed to be in a good place." (AR 1255.)

On the other hand, there were days when the staff recorded that Zoe "seemed to purposefully be pushing boundaries during shift, ignoring rules and staff direction many times." (AR 1321.) Once, she had a phone call with her dad that "bec[a]me heated very quickly and [Zoe] ended [the] phone call." (AR 1321.) Another day, she "seemed to be distant . . . and sarcastic." (AR 1303.) A few days later, Zoe "[s]eemed more sad . . . . When staff approached [her] about it, [she] at first tried to avoid talking about it but with a little more probing attributed her decline in mood to going off of or decreasing some of her meds. She did not make efforts to

connect with girls in the house and kept mostly to herself. . . . [She] showed signs of frustration, complacence, and impatience." (AR 1296.) On September 2, Zoe "[d]isplayed [a] guarded affect" and "didn't express much emotion towards anything . . . [she] didn't want to talk about anything personal." (AR 1271-72.) And on September 3, Zoe "seemed to really struggle with her depression. . . . [She] refused to participate in the recreational therapy task today. She said that she has no motivation to do anything." (AR 1259.)

In sum, Zoe's condition in the two weeks before August 21 and the two weeks after August 21 was essentially identical. Sometimes she was depressed, sometimes she was happy. Given this, it appears entirely arbitrary for Regence to conclude, as it did, that Zoe's treatment at New Haven before August 21 was medically necessary, but that treatment after August 21 was not medically necessary.

And going slightly beyond that two-week window, there were reasons to remain concerned about whether Zoe had actually made much progress. On September 6, a therapist observed that Zoe expressed "little interest in improving her relationship with her dad or benefitting from being at New Haven." (AR 1242.) On September 8, she "said during [group therapy] that she was feeling depressed" and that "she realized that she still self-harms just in different ways like hitting her head or slapping herself." (AR 1231.) And most significantly, on November 21, 2014, "[Zoe] had signs of self harm [that] another staff notice[d]. Staff searched her room and found a pencil sharpener without a blade that had pencil shaving inside. Staff could not find the blade anywhere. Also found interesting letters and notes that may have caused the action." (AR 740.) Dr. Stein or Dr. Marks do not explain why these incidents did not raise concerns that the August 21 date was premature.

Frankly, the most logical explanation for Regence's decision is simple impatience.  On June 19, 2014, Regence had asked New Haven about the average length of stay there, and had advised New Haven that "the MCG expects most [patients] can meet treatment goals within 30 days."[7]  (AR 13730.)  By August 21, 2014, the treatment had lasted 72 days.  Given the arbitrariness of the date selected by Regence, it appears to the court that the decision was based more on preconceived notions regarding the maximum amount of time a person should receive care, rather than on a case-specific assessment of Zoe's needs.  This is inappropriate.  See H.N., 2016 WL 7426496 at *4 ("The MCG might be a helpful tool but were not intended to operate as a sole basis for denying treatment or payment. The MCG are to be applied to individual patients on a case-by-case basis and always in the context of a qualified healthcare professional's clinical judgment.").

IV.     CONCLUSION

Based on the above, the court concludes (1) that the MCG should not have been applied in this case, and that once disregarded, Plaintiffs demonstrated by a preponderance of the evidence that Zoe's continued treatment at New Haven was medically necessary, and (2) even if the MCG applied, Plaintiffs' carried their burden because Regence's reviewers did not accurately apply the MCG to Zoe's case.  Accordingly, the court concludes that Plaintiffs are entitlement to further benefits under the plan.

//

//

---

[7] As noted, according to the H.N. court, an article cited by the MCG actually acknowledges that, in the case of adolescents, residential programs typically last from six months to several years.  H.N., 2016 WL 7426496 at *8.

**ORDER**

Regence's Motion for Summary Judgment (ECF No. 27) is DENIED. Plaintiffs' Motion

for Summary Judgment is (ECF No. 28) is GRANTED.

DATED this 27th day of September, 2019.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge